**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Case No. No. 18-cv-1212-PAB-MEH

LISA MILES A.K.A ELISA MARIE MILES; and those similarly situated

      Plaintiffs,

v.

BKP INC.;
ELLA BLISS BEAUTY BAR LLC;
ELLA BLISS BEAUTY BAR - 2, LLC;
ELLA BLISS BEAUTY BAR - 3, LLC;
BROOKE VANHAVERMAAT;
KELLY HUELSING; AND
PETER KOCLANES

      Defendants.

---

**AMENDED CLASS AND COLLECTIVE ACTION COMPLAINT**

---

**INTRODUCTION**

1.      The business operation of Ella Bliss Beauty Bar is founded on the exploitation of its workers.

2.      Customers pay almost $80 for a manicure and a pedicure, yet out of that almost $80, Plaintiff Lisa Miles, like other nail technicians, would receive only $.85 cents in commission. When Ella Bliss had offered Ms. Miles the job, it had promised to pay her $3.90 in commission for a manicure and pedicure service.

3.      Ella Bliss also often did not pay Lisa Miles or many of the other Service Technicians at any of its three stores *any amount whatsoever* for the hours that they spent cleaning and performing other mandatory chores. In fact, Ella Bliss did not employ daily janitors

or a daily cleaning service and relied exclusively on the often unpaid labor of its nail technicians and other Service Technicians to clean the salon.

4.      Ella Bliss's policies and practices governing compensation, including its failure to pay Plaintiff and its other Service Technicians promised commissions, its failure to pay them for the time that they spent cleaning and doing other chores, and its failure to pay overtime, are illegal and constitute, among other things, violations of the Fair Labor Standards Act and the Colorado Wage Claim Act.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331, and supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over Plaintiff's related claims under state law.

6.      Venue is proper pursuant to 28 U.S.C. § 1391 because all Defendants reside in Colorado or are registered to do business in Colorado.

## PARTIES

7.      At all times material to the allegations of the complaint, Plaintiff Lisa Miles was a resident of and domiciled in the District of Colorado.

8.      Plaintiff Lisa Miles signed a written consent to be a named Plaintiff in a Fair Labor Standards Act collective action and the signed consent is attached to this Complaint as Exhibit 1.

9.      At all times material to the allegations of the complaint, Defendant ELLA BLISS BEAUTY BAR LLC (hereinafter "Ella Bliss 1") was a Colorado limited liability company with its principal place of business in the District of Colorado.

10. At all times material to the allegations of the complaint, Defendant ELLA BLISS BEAUTY BAR - 2, LLC (hereinafter "Ella Bliss 2") was a Colorado limited liability company with its principal place of business in the District of Colorado.

11. At all times material to the allegations of the complaint, Defendant ELLA BLISS BEAUTY BAR - 3, LLC (hereinafter "Ella Bliss 3") was a Colorado limited liability company with its principal place of business in the District of Colorado.

12. At all times material to the allegations of the complaint, Defendant BKP INC. (hereinafter "BKP") was a Colorado corporation with its principal place of business in the District of Colorado.

13. Ella Bliss 1, Ella Bliss 2, Ella Bliss 3, and BKP shall hereinafter be referred to as the "Entity Defendants."

14. At all times material to the allegations of the complaint, Defendant Vanhavermaat was a natural person residing and domiciled in the District of Colorado.

15. At all times material to the allegations of the complaint, Defendant Huelsing was a natural person residing and domiciled in the District of Colorado.

16. At all times material to the allegations of the complaint, Defendant Koclanes was a natural person residing and domiciled in the District of Colorado.

17. Defendant Vanhavermaat, Defendant Huelsing, and Defendant Koclanes are hereinafter referred to as the "Individual Defendants."

## STATEMENT OF FACTS

### I.   Ella Bliss

18.     Brooke Vanhavermaat, her sister, Kelly Huelsing, and their father, Peter Koclanes formed BKP in 2013. Defendant Vanhavermaat is the President of BKP, and Defendant Huelsing is the Vice President.

19.     BKP is the parent company of Ella Bliss 1, Ella Bliss 2, and Ella Bliss 3. Ella Bliss 1 is located in Greenwood Village, Colorado; Ella Bliss 2 is in Denver, Colorado; and Ella Bliss 3 is in Highlands Ranch, Colorado.

20.     Ella Bliss 1, Ella Bliss 2, and Ella Bliss 3 (collectively "Ella Bliss") provide services like those typically offered at a day spa or salon, including massages, manicures and pedicures, blowouts, facials, waxing, eyelash extensions, and makeup consultations and application.

21.     Customers at Ella Bliss pay a set price for each service they purchase. For example, Ella Bliss charges $78 for a manicure/pedicure combination. However, customers can pay a monthly membership fee and receive membership benefits that include a discounted rate on services.

22.     Ella Bliss employs various "Service Technicians" to perform the services that it offers. Service Technicians include nail technicians, cosmetologists, estheticians, and massage therapists.

23.     There are approximately twenty-five (25) to thirty-five (35) Service Technicians employed by each Ella Bliss location at any given time.

24.     All Service Technicians employed by Ella Bliss were subject to the same employment policies.

4

## II.   Plaintiff Miles's Employment by Defendants

25.     Defendants hired Plaintiff Lisa Miles to work as a nail technician in March 2016.

26.     Plaintiff worked primarily at Ella Bliss 2 in Denver, but she also worked intermittently at Ella Bliss 1 in Greenwood Village for most of her employment.

27.     Plaintiff and Ella Bliss entered into a contract in which Ella Bliss agreed that it would pay Plaintiff $17 per hour, plus 5% commissions on services. In approximately fall 2016, Plaintiff received a raise to $18 per hour.

28.     Also in fall 2016, Plaintiff began working as a "lead" nail technician. Leads were responsible for training the other Service Technicians and "setting a good example."

29.     Plaintiff worked as a lead nail technician until approximately July 2017, when she stepped down from her position as lead.

30.     During her employment, Plaintiff consistently complained about Ella Bliss's pay practices. Plaintiff also complained about other practices at Ella Bliss, including that employees made inappropriate race and sex-based comments and that Ella Bliss retained nail technicians who were not competent at their job.

31.     In September 2017, Ella Bliss terminated Plaintiff's employment. Defendant Koclanes informed Plaintiff of her termination. When Plaintiff asked him why Ella Bliss was firing her, he refused to provide a reason.

## III.   Defendants Jointly Employed Plaintiff Miles and Those Similarly Situated

32.     The individual Defendants, Defendants Vanhavermaat, Koclanes, and Huelsing, were each very involved in setting policies for Ella Bliss and managing and supervising the day-to-day operations at all Ella Bliss locations.

33.     Defendant Vanhavermaat, either individually or in consultation with Defendants Koclanes and Huelsing, set all policies, rules, and standards for Ella Bliss Service Technicians. Defendants Vanhavermaat, Koclanes, and Huelsing, as well as the store managers under their direction, implemented these policies, rules, and standards.

34.     In addition to setting the rules for Service Technicians, Defendants Vanhavermaat, Koclanes, and Huelsing controlled Service Technicians' conditions of employment by personally supervising their work. The individual Defendants were often present at each of the three stores, and usually each Defendant came by each store at least once a week to supervise.

35.     Defendants Vanhavermaat, Koclanes, and Huelsing also ran quarterly, mandatory meetings for all Ella Bliss employees, including Service Technicians. Defendant Vanhavermaat led the meetings the majority of the time, but Defendants Koclanes and Huelsing also spoke at the meetings. During the meetings, Defendants Vanhavermaat, Koclanes, and Huelsing communicated to the employees company rules and policies, including those governing Service Technicians' work and compensation.

36.     Furthermore, Defendants Vanhavermaat, Koclanes, and Huelsing made decisions regarding the hiring and firing of the Service Technicians.

37.     Along with the Individual Defendants, the entity Defendants—BKP, Ella Bliss 1, Ella Bliss 2, and Ella Bliss 3—jointly employed Plaintiff and those similarly situated.

38.     The Entity Defendants jointly exercised substantial control over the terms and conditions of the work of Plaintiffs and other Service Technicians.

39.     The Entity Defendants co-determined the policies, procedures, and rules, including those relating to compensation, benefits, and hours, governing all Service Technicians at all three Ella Bliss stores.

40.     Through the individual Defendants, who controlled the Entity Defendants, the Entity Defendants jointly had the ability to fire and hire Service Technicians, to control the terms and conditions of their employment, and decide when and at what store a Service Technician would work.

41.     While most of Plaintiff Miles's paychecks were issued by Ella Bliss 2, BKP occasionally issued her paychecks.

**IV.    Ella Bliss's Illegal Pay Practices**

42.     Policies were companywide at all Ella Bliss stores and applied to all Service Technicians.

43.     Ella Bliss made clear that its wage policies applied to all Service Technicians as follows.

44.     Ella Bliss provided each Service Technician a form offer letter—which, when accepted by the Service Technician, became a contract—and a "Customer Service Contract" setting forth Ella Bliss's policies. These policies provided, as discussed more fully below: one, Service Technicians had to arrive fifteen minutes prior to the start time of each scheduled shift; two, Ella Bliss did not pay its Service Technicians for downtime (with certain exceptions); and three, Ella Bliss would pay a percentage commission for each service the Technician performed.

45.     In addition to the contract, Ella Bliss communicated rules and polices that governed Service Technicians through its Handbook and via group emails to all Service

Technicians. The Handbook and emails discussed, among other things, Ella Bliss's policy regarding downtime.

46.     Ella Bliss also held mandatory companywide meetings, at least quarterly, at which it discussed its policies, including those regarding downtime and commissions.

47.     Ella Bliss explicitly and willfully maintained policies that violate state and federal wage and hour laws in at least the following ways.

**A. Failure to Pay for Downtime**

48.     After the first 60 days of employment, Ella Bliss does not compensate its Service Technicians for downtime. Rather, Ella Bliss only pays for "service time," meaning the time when the Technicians are serving customers (e.g., when nail technicians are doing a manicure or pedicure).

49.     Ella Bliss's contract with Plaintiff Miles states that Plaintiff would be paid $17/hour per "service hour" but she would not receive any downtime pay after the first 60 days of employment. The contract provided that Ella Bliss would pay Plaintiff $5.50 /hour for downtime for her first 60 days.

50.     Although Ella Bliss paid other Service Technicians and even other nail technicians marginally different hourly rates, the policies to which Plaintiff was subject applied to every Service Technician at all three locations.

51.     The policies provided that the only Service Technicians paid for downtime (after the first 60 days of employment) were assistant lead technicians and lead technicians. For instance, Ella Bliss's policy during Plaintiffs' employment was to pay $5.50/hour to assistant lead nail technicians for downtime and $6.50/hour to lead nail technicians for downtime.

8

However, the rate was negotiable; for instance, Plaintiff Miles earned $7/hour for downtime when she worked as a lead technician.

52.     During downtime, Ella Bliss prohibited its Service Technicians from leaving the premises of the store if they had less than an hour between scheduled services.

53.     If a Service Technician had more than an hour between scheduled services, Ella Bliss sometimes allowed the Technicians to leave the premises, but only with explicit permission from the manager. If allowed to leave, Ella Bliss expected Service Technicians to be on-call and able to return within 15 minutes in order to serve walk-in customers who had not booked services in advance.

54.     Ella Bliss communicated through group emails to all Service Technicians its requirements that Service Technicians remain on the premises if they had less than an hour between scheduled services and remain on-call if they had more than one hour between scheduled services. The emails reminded the Technicians that leaving the premises during downtime was a "privilege" not a "right."

55.     During downtime, Ella Bliss expected its Service Technicians to perform tasks for the benefit of Ella Bliss, such as cleaning and folding towels. Indeed, Ella Bliss explicitly required Plaintiff to agree in her "Customer Service Contract" that she would "participate in downtime activities when not in service."

56.     Ella Bliss did not employ a daily janitorial service and instead relied on its Service Technicians to do all the daily cleaning. If the Service Technicians did not do a good enough job cleaning, their supervisors, including Defendants Vanhavermaat and Huelsing and especially Defendant Koclanes, would reprimand them.

57.     Ella Bliss also held companywide meetings at which managers, including Defendant Vanhavermaat, would tell the Service Technicians that they were not doing a good enough job cleaning on their downtime and that they needed to do better.

**B. Failure to Pay for Pre- and Post-Shift Work**

58.     Pursuant to Plaintiffs' "Customer Service Contract," Ella Bliss required them to "arrive fifteen minutes prior to [the] start time of [their] scheduled shift." Ella Bliss also required Plaintiffs to "participate in beginning/end of shift duties" and "check out with Concierge, Lead, or Management before leaving for the day."

59.     Ella Bliss required its Service Technicians to arrive 15 minutes early in order to prepare and set up for their first service.

60.     Ella Bliss also required its Service Technicians to stay after the end of their last service to do chores. It typically took the Service Technicians at least thirty minutes at the end of each shift to finish their chores.

61.      Service Technicians' chores included cleaning their service area and implements. Additionally, each type of Service Technician had technician specific chores. For example, nail technicians had to fold and put away towels, restock their stations, and clean pedicure bowls.

62.     Service Technicians also had to do general cleaning, like cleaning the bathroom and kitchen.

63.     Ella Bliss expected each Technician to do two to four chores each shift, including at least one technician specific chore and one general cleaning chore.

64.     Ella Bliss did not pay its Service Technicians for their pre- and post-shift work.

### C. Withholding Tips to Compel Work

65.     Ella Bliss required the Service Technicians to check out with a manager before they could leave at the end of their shift.

66.     The managers kept the Service Technicians' cash tips in a lock box behind the front desk. In order for a Service Technician to collect her tips from the shift, Ella Bliss required her to check out with a manager.

67.     Ella Bliss ensured that the Service Technicians did their chores by withholding the Technicians' tips until they finished their chores. The managers withheld a Service Technician's tips until the manager verified that the Service Technician had completed her chores.

68.     If the Service Technician did not check out with a manager or did not do her chores, Ella Bliss kept her tips, sometimes for up to a week at a time, until she did her chores at the end of another shift.

### D. Failure to Pay Commissions

69.     In Plaintiff Miles's contract with Ella Bliss, Ella Bliss agreed to pay her "5% commission on services."

70.     The plain language of the contract provision, and Plaintiffs' understanding of the provision, meant that Ella Bliss would pay Plaintiffs 5% of the service price for each service performed.

71.     For example, the one-hour Signature Nail Service—a manicure and pedicure—cost the customer $78. Plaintiff Miles thus should have received a $3.90 commission on such a service.

72.     Regular industry practice is to pay nail technicians and other similar service providers a commission calculated in this manner: a percentage of the service rate—the cost to the customer—of the service performed.

73.     However, despite the pain language of Ella Bliss's Service Technicians' contracts and despite the industry standard, Ella Bliss paid its Service Technicians commissions based on their hourly rate. So, if Plaintiff Miles worked for one hour to complete a Signature Nail Service, Ella Bliss paid her only $.85 in commission—5% of her hourly rate of $17—instead of the $3.90 to which she was entitled.

74.     Defendants' failure to pay commissions on the service rate applied to all Service Technicians. To ensure that there was no confusion, near when Plaintiff Miles first started working for Ella Bliss, Defendant Vanhavermaat held a mandatory companywide meeting at which she reiterated that (contrary to its written contract) Ella Bliss paid commissions on each Service Technician's rate (their hourly pay), not the cost of the service to the customer.

**V.     Defendants' Illegal Pay Policies and Practices Caused Unpaid Overtime**

75.     The off-the-clock time resulting from the illegal pay policies described above, including Ella Bliss's failure to pay for downtime and mandatory pre- and post-shift work, led to Plaintiff Miles and other Service Technicians not being paid for all hours worked, which included unpaid overtime for hours worked in excess of 40 in a workweek.

76.     For example, if Plaintiff Miles worked fifty hours a week including downtime and pre- and post-shift work, Ella Bliss paid her only for twenty to thirty-five hours: the amount of time when she was actually doing services.

77.     On average, Plaintiff Miles worked twenty to thirty-five hours per week in service time, but she regularly worked more than forty hours a week including downtime and pre- and post-shift-work time.

78.     Thus, although Service Technicians including Plaintiff Miles often worked over forty hours a week, because Ella Bliss paid them only for service time and not for downtime or mandatory pre- and post-shift work, Ella Bliss never paid them any overtime pay.

79.     Ella Bliss did not pay Plaintiff Miles overtime pay in almost every workweek during her employment with Ella Bliss.

80.     For example, during the work week of Sunday, May 29, 2016, Ella Bliss compensated Plaintiff Miles for approximately thirty hours. Because of the illegal pay policies, she was not compensated for at least 10 hours of straight time and at least 10 to 15 hours of overtime.

81.     As another example, during the work week of Sunday, June 5, 2016, Ella Bliss compensated Plaintiff Miles for approximately thirty hours. Because of the illegal pay policies, she was not compensated for at least 10 hours of straight time and at least 10 to 15 hours of overtime.

**VI.     Ella Bliss's Illegal Prohibition on Employees Discussing their Pay**

82.     Since Ella Bliss opened its first store in 2013 and continuing through the present, Ella Bliss has had a policy illegally prohibiting employees, including Service Technicians, from discussing their pay, or any issues about their pay, with each other.

83.     Defendant Vanhavermaat regularly instructed each store's managers and assistant managers to tell every employee when she was hired or received a pay increase that she needed to keep information about her pay confidential. During weekly meetings with all managers and

assistant managers, Defendant Vanhavermaat often reiterated that employees needed to keep their pay confidential.

84.     When Defendant Vanhavermaat was present when a manager was hiring or promoting an employee, Defendant Vanhavermaat would instruct the employee to keep information regarding her pay confidential.

85.     Ella Bliss managers specifically instructed Service tTechnicians who were paid for their downtime that such payments would cease if they told other employees that they received downtime pay.

86.     Managers also told Service Technicians that they could not discuss their cash tips with each other.

87.     On at least one occasion, after some Ella Bliss employees had been discussing specific questions that they had about their pay in the store's break room, Defendants Vanhavermaat and Huesling asked each of those employees to meet with them individually. At those meetings, Defendants Vanhavermaat and Huesling told each employee that if she had any issues about pay, she should ask the Individual Defendants, as they did not want the employees talking to each other about their pay issues. Apparently, Defendant Vanhavermaat or Defendant Huesling had been listening to the employees' conversation in the break room via the camera installed there (each store's break room has a camera), or a manager who had seen the camera footage told Defendants Vanhavermaat and Huesling what the employees were discussing.

88.     Defendants Vanhavermaat and Huesling also regularly told and emailed Ella Bliss employees the same message, that if an employee had issues with her pay, she needed to talk to the Individual Defendants, not other employees. This message was often conveyed right after employees had been discussing concerns about pay in the break room.

89.     After the original Complaint in this lawsuit was filed, an Ella Bliss Manager told one or more Service Technicians who had been talking to other employees about concerns regarding Ella Bliss's pay practices to stop doing so.

90.     Defendants' policy prohibiting Ella Bliss employees from discussing pay with each other demonstrates Defendants' knowledge that their pay practices were illegal and efforts to prevent employees who had suspicions from discussing them with other employees.

91.     Defendants' stated policy also makes it more likely that Defendants retaliated against current and former Ella Bliss employees who raised concerns about Ella Bliss pay practices with other employees, the Individual Defendants, or through more formal complaints.

**VII.    Defendants Retaliated against Plaintiff Miles for Filling this Lawsuit and Threatened to Retaliate against other Current or Former Employees of Ella Bliss for Engaging in Similarly Protected Activity**

92.     After Plaintiff Lisa Miles filed this lawsuit, Defendants retaliated against her and threatened other current and former Ella Bliss employees for raising concerns about their pay with other employees, Defendants, and the Colorado Department of Labor and Employment ("CDLE").

93.     Defendants' conduct and statements also constituted an attempt to coerce potential class/collective action members into excluding themselves from the litigation and to prevent cooperation with Plaintiffs and Plaintiffs' counsel.

94.     Immediately after Plaintiff Miles filed the original Complaint in this action on May 17, 2018, Defendants Vanhavermaat and Huelsing sent an email to all Ella Bliss employees. The email stated that Defendants were "outright flabbergasted" by the lawsuit, and Plaintiff Miles was "us[ing] the media to support unfounded accusations and slanderous statements

directly [sic] at Ella Bliss." Defendants Vanhavermaat and Huelsing wrote that Defendants were

"working diligently to protect everyone from these premeditated and slanderous comments":

> [W]e will vigorously and aggressively defend all false accusations and the
> unfortunate slanderous comments. We assure you, that we will undoubtedly prove
> that the motivation is nothing more than an attempt to economically harm the hard
> earned business that we together, have all work[ed] so hard to grow over the past
> five years.

95.     Defendants Vanhavermaat and Huelsing concluded the May 17th email by

requesting that Ella Bliss employees "refrain from speaking with any news outlet as [Defendants

would] be handling all response internally."

96.     About a week or two later, Defendants Vanhavermaat, Huelsing, and Koclanes

held mandatory "town hall" meetings that they required all employees to attend. At these

meetings, Defendants again characterized the lawsuit as "slanderous," painting Plaintiff Miles as

a disgruntled employee making up lies about Ella Bliss for the sole purpose of harming

Defendants.

97.     Defendant Koclanes stated at one of the meetings that "it's unfortunate that

somebody wants to set up a press conference in front of our doors, but there's a price to pay for

it…and [Defendants were] going to hold them accountable." Defendant Koclanes also said that

Defendants had hired "the "biggest guns" to represent them, and the lawsuit was baseless.

98.     The Individual Defendants made these statements to intimidate and discourage

Ella Bliss employees from joining the lawsuit and cooperating with Plaintiff Miles and Plaintiffs'

counsel. These statements further show an intent to intimidate and/or retaliate against any current

or former Ella Bliss employee who participates in proceedings related to the lawsuit.

99.     Despite the town hall meetings ostensibly providing an opportunity for Ella Bliss

employees to ask Defendants any questions they had about their pay, when employees tried to

16

ask questions, Defendants Vanhavermaat and Huesling told them that they were not going to discuss their concerns in front of everyone. Instead, employees were told that they needed to set up individual meetings with Defendants Vanhavermaat and Huesling to discuss their concerns.

100.    Also during one of the town hall meetings, Defendants threatened employees who refused to blindly and without question accept Defendants' explanation that Ella Bliss's pay practices are not illegal. For instance, when a Service Technician repeatedly questioned the legality of Ella Bliss's pay practices, Defendant Vanhavermaat looked at her and pointedly reminded her that Ella Bliss is an at-will establishment, meaning Defendants could fire her at any time. This threat was calculated to intimidate and silence not just the employee asking questions, but also all other employees at the mandatory meeting.

101.    A short while after the meeting, Defendant Koclanes told another employee that that Service Technician and another Service Technician who had raised numerous concerns during the meeting needed to stop discussing these issues and he wished they would just quit.

102.    After the town hall meetings, Ella Bliss employees who had been very vocal at the meetings or had otherwise individually raised concerns about pay to the Individual Defendants observed that the Individual Defendants were scrutinizing their every move, looking for any mistake or reason to fire them.

103.    In fact, various Ella Bliss employees have observed that since the first store opened, employees who raise concerns about pay do not remain employed at Ella Bliss.

104.    Demonstrating Defendants' pattern and practice of intimidation and retaliation, just after this law suit was filed, Ella Bliss fired a Service Technician who had approached Defendant Vanhavermaat about pay concerns after calling the CDLE and learning that the manner in which Ella Bliss was compensating employees may not be legal.

17

105.     Two weeks after Defendants fired her, Defendant Koclanes called the Service

Technician three times in one day. She did not answer his calls. Defendant Koclanes—whom she

had seen at the "town hall" meeting but had never met or spoken with—left her a voicemail

message saying, "It's imperative that we speak as soon as possible regarding the multiple phone

calls and accusations and everything else that you have placed our way. I urge you to give me a

call back as soon as possible."

106.     The Service Technician had no idea why Defendant Koclanes was calling her; she

could only assume he was referring to the calls she had made to CDLE. She felt that Defendant

Koclanes was threatening her, and she was frightened.

107.     Defendant Koclanes also intimidated another Service Technician in order to

discourage her from participating in the lawsuit or otherwise voicing of concerns regarding Ella

Bliss's illegal conduct. When speaking with the Service Technician at one of the stores, he told

her something to the effect of, "when this is over, [Plaintiff Miles and her lawyers] are going to

have to apologize to us [Defendants]." He also warned that Defendants had "done some

research" and "learned some things." The Service Technician understood Defendant Koclanes'

statement as a threat that Defendants were digging for information to use against the Ella Bliss

employees who sued them or cooperated with the suit. The Service Technician started to feel

very concerned and worried about whether she should speak to Plaintiffs' attorneys or if doing so

would cause Defendants to retaliate against her.

108.     The Individual Defendants likely took additional actions with other current and

former Ella Bliss employees for the purpose of intimidating workers and discouraging

participation in, and cooperation with, the lawsuit, including but not limited to veiled threats that

Defendants would retaliate against those who did participate in proceedings related to the lawsuit.

109.    And in fact, Defendants did retaliate against individuals who participated in the lawsuit. Defendants filed counterclaims against Plaintiff Miles because she had brought claims against Defendants under the FLSA, the CWCA, and other laws. Defendants sued Plaintiff Miles solely because of her suit against Defendants.

110.    Indeed, the only basis for Defendants' third counterclaim against Plaintiff Miles, labeled "intentional interference with prospective business advantage," is Plaintiff Miles's filing claims against Defendants and discussing such claims and the allegations on which the claims are based with the media and current and former Ella Bliss employees.

111.    Not only are Defendants' counterclaims against Plaintiff Miles intended to punish her for filing the lawsuit, Defendants also intended the counterclaims to deter other potential class/collective action members from participating in the suit. Defendants' second counterclaim, labeled "rights in stolen property," illustrates this intent.

112.    The counterclaim alleges that "Plaintiff [Miles] *and other putative class members* knowingly used [a] thing of value in such a manner as to deprive Defendants permanently of its use or benefit." [Doc. 124], p. 40, ¶ 33 (emphasis added). Without at the very least naming the "putative class members" to whom the allegation refers, the counterclaim clearly cannot adequately state a claim against any other potential plaintiffs.

113.    Thus, Defendants' only purpose in including the allegation accusing unnamed Ella Bliss employees of theft was to deter them from participating in the suit. Essentially, Defendants sent a message to putative/potential class action members that if they decide to join Plaintiff Miles in asserting claims against Defendants, they will be risking potential liability.

## RULE 23 CLASS ALLEGATIONS

114.    Plaintiff alleges all claims, other than the FLSA claims, as a Fed R. Civ. P. 23

class action on her own behalf and on behalf of classes for which she seeks certification.

115.    Pending any modifications necessitated by discovery, Plaintiff preliminarily

defines the "Rule 23 Class" as follows:

> ALL CURRENT AND FORMER SERVICE TECHNICIANS
> WHO WORKED AT ANY OF ELLA BLISS BEAUTY BAR'S
> THREE LOCATIONS

116.    The class is so numerous that joinder of all potential class members is

impracticable. Plaintiff does not know the exact size of the class since that information is within

the control of Defendants. However, Plaintiff estimates that, based on the size of Ella Bliss's

operations, the class is composed of well over 80 persons. The exact size of the class will be

easily ascertainable from Defendants' records.

117.    There are questions of law or fact common to the classes that predominate over

any individual issues that might exist. Common questions of law and fact include: Defendants'

pay practices and Defendants' failure to pay employees all they are legally owed.

118.    The class claims asserted by Plaintiff are typical of the claims of all the potential

class members because she experienced the same or similar working conditions and pay

practices as Defendants' other employees. A class action is superior to other available methods

for the fair and efficient adjudication of this controversy because numerous identical lawsuits

alleging similar or identical causes of action would not serve the interests of judicial economy.

This is especially true in the case of low-wage, hourly workers like the class members here, who

are unsophisticated, are unlikely to seek legal representation, cannot realistically navigate the

legal system pro se, and whose small claims make it difficult to retain legal representation if they do seek it.

119.    Plaintiff will fairly and adequately protect and represent the interests of the class. Plaintiff was Defendants' employee and was a victim of the same violations of law as the other class members, including numerous violations of federal and state wage and hour laws.

120.    Plaintiff is represented by counsel experienced in litigation on behalf of low-wage workers and in wage and hour class actions.

121.    The prosecution of separate actions by the individual potential class members would create a risk of inconsistent or varying adjudications with respect to individual potential class members that would establish incompatible standards of conduct for Defendants.

122.    Each class member's claim is relatively small. Thus, the interest of potential class members in individually controlling the prosecution or defense of separate actions is slight. In addition, public policy supports the broad remedial purposes of class actions in general and that the pertinent federal and state laws are appropriate vehicles to vindicate the rights of those employees with small claims as part of the larger class.

123.    Plaintiff is unaware of any members of the putative class who are interested in presenting their claims in a separate action.

124.    Plaintiff is unaware of any pending litigation commenced by members of the class concerning the instant controversy.

125.    It is desirable to concentrate this litigation in this forum because all parties are domiciled in this jurisdiction or are registered to do business in this jurisdiction.

126.    This class action will not be difficult to manage due to the uniformity of claims among the class members and the susceptibility of wage claims to both class litigation and the use of representative testimony and representative documentary evidence.

127.    The contours of the class will be easily defined by reference to the payroll documents Defendants were legally required to create and maintain. *See* 29 C.F.R. § 516, *et seq.*

## 29 U.S.C. § 216(b) COLLECTIVE ACTION ALLEGATIONS

128.    Plaintiff brings her FLSA claim as a collective action, pursuant to 29 U.S.C. § 216(b), on behalf of herself and on behalf of all other similarly situated current and former employees of Defendants.

129.    Pending any modifications necessitated by discovery, Plaintiff preliminarily defines the "216(b) Class" as follows:

> ALL CURRENT AND FORMER SERVICE TECHNICIANS
> WHO WORKED AT ANY OF ELLA BLISS BEAUTY BAR'S
> THREE LOCATIONS

130.    All potential FLSA class members are similarly situated because, among other things, they all worked as Service Technicians for Defendants. Moreover, all members of the class suffered from the same policies of Defendants resulting in unpaid overtime in overtime workweeks, including:

      a.    Failure to account for "downtime" work in determining overtime compensation.

      b.    Failure to account for pre- and post-shift work in determining overtime compensation.

<u>**CLAIMS FOR RELIEF**</u>

**FIRST CLAIM FOR RELIEF**
**Unpaid Overtime Under The Fair Labor Standards Act**
**29 U.S.C. §§ 201, *et seq*.**
**(Named Plaintiff and the 216(b) Class vs. All Defendants)**

131.    Plaintiff hereby incorporates all paragraphs of this Complaint as though fully set forth herein.

132.    Plaintiff Miles brings her FLSA claim as a collective action, pursuant to 29 U.S.C. § 216(b), on behalf of herself and on behalf of all other similarly situated current and former employees of Defendants.

133.    All Defendants employed Plaintiff Miles and those similarly situated pursuant to the Fair Labor Standards Act.

134.    Each Defendant is or was a member of an enterprise that had annual revenues in excess of $500,000 during Plaintiff Miles's employment and had two or more employees that handled goods or materials that had been moved in or produced for interstate commerce. Defendants were therefore part of an enterprise or enterprises engaged in commerce pursuant to 29 U.S.C. § 203(s)(1).

135.    As employers of Plaintiff Miles and those similarly situated, Defendants named in this claim were required to pay Plaintiff and those similarly situated overtime pursuant to 29 U.S.C. § 207 and failed to do so.

136.    Defendants' failure to pay overtime was caused by their failure to include downtime and pre- and post-shift work as compensable time for the purposes of calculating FLSA overtime.

23

137.     Defendants' failure to pay their employees as required by the FLSA was willful pursuant to 29 U.S.C. § 255(a).

138.     Plaintiff Miles and those similarly situated are therefore entitled to the following pursuant to 29 U.S.C. § 216:

      i.     unpaid overtime;

      ii.    gap time for any workweek in which overtime is owed;

      iii.   statutory liquidated damages;

      iv.   reasonable attorney's fees and costs.

139.     As employers, Defendants are jointly and severally liable to Plaintiff Miles and the 216(b) Class.

### SECOND CLAIM FOR RELIEF
**Unpaid Overtime Under Colorado Law**
**COLO. REV. STAT. §§ 8-4-101, *et. seq.*, 8-6-118; Colorado Wage Order**
**(Named Plaintiff and the Rule 23 Class vs. the Entity Defendants)**

140.     Plaintiff hereby incorporates all paragraphs of this Complaint as though fully set forth herein.

141.     As set forth above, Plaintiff asserts this count on her own behalf and on behalf of all those similarly situated pursuant to Fed. R. Civ. P. 23.

142.     The Entity Defendants all employed the Plaintiff and those similarly situated.

143.     Plaintiff and those similarly situated worked for these Defendants as hourly employees and these Defendants failed to pay Plaintiffs and those similarly situated overtime for all hours worked in excess of 40 in a week.

144.     Defendants' failure to pay overtime was caused by their failure to account for downtime hours and pre- and post-shift hours for the purposes of calculating overtime.

145.    Therefore, Defendants failed to pay overtime pursuant to the relevant state statutes and regulations, including Colo. Rev. Stat. § 8-6-118 and the Colorado Wage Order.

146.    Plaintiff and those similarly are owed overtime premiums and any applicable damages, penalties, or attorney's fees under those protections and the CWCA, Colo. Rev. Stat. § 8-4-101, *et seq.*

147.    Plaintiff demands payment on behalf of herself and all putative class members for whom she brings this claim in an amount sufficient to provide compensation for all unpaid wages. This demand for payment is continuing and is made on behalf of any putative class members whose employment has terminated or terminates at any time in the future or who have been inadequately paid on any regular pay periods and who continue to be employed by these Defendants. Such payment should be made care of undersigned counsel at undersigned counsel's address, included in the signature block.

**THIRD CLAIM FOR RELIEF**
**Unpaid Straight Time Under The Colorado Wage Claim Act ("CWCA")**
**COLO. REV. STAT. §§ 8-4-101, *et seq.***
**(Named Plaintiff and The Rule 23 Class vs. the Entity Defendants)**

148.    Plaintiff hereby incorporates all paragraphs of this Complaint as though fully set forth herein.

149.    As set forth above, Plaintiff asserts this count on her own behalf and on behalf of all those similarly situated pursuant to Fed. R. Civ. P. 23.

150.    The Entity Defendants all employed Plaintiff and those similarly situated.

151.    Plaintiff and those similarly situated worked for these Defendants as hourly employees and these Defendants failed to pay Plaintiff and those similarly situated for all hours worked.

152.     This unpaid time, including unpaid overtime, was caused by Defendants' failure to compensate Plaintiff and those similarly situated for downtime and pre- and post-shift time.

153.     As such, these Defendants failed to pay all wages due under the law and therefore violated state wage payment statutes, including Colo. Rev. Stat. § 8-4-101 *et seq.*

154.     Plaintiff and those similarly situated are entitled to damages and attorneys' fees for their unpaid time.

155.     Plaintiff demands payment on behalf of herself and all putative class members for whom she brings bring this claim in an amount sufficient to provide compensation for all unpaid wages. This demand for payment is continuing and is made on behalf of any putative class members whose employment has terminated or terminates at any time in the future or who have been inadequately paid on any regular pay periods and who continue to be employed by these Defendants. Such payment should be made care of undersigned counsel at undersigned counsel's address, included in the signature block.

### FOURTH CLAIM FOR RELIEF
**Unpaid Commissions Under The Colorado Wage Claim Act ("CWCA")**
**COLO. REV. STAT. §§ 8-4-101, *et seq.***
**(Named Plaintiff and The Rule 23 Class vs. the Entity Defendants)**

156.     Plaintiff hereby incorporates all paragraphs of this Complaint as though fully set forth herein.

157.     As set forth above, Plaintiff asserts this count on her own behalf and on behalf of all those similarly situated pursuant to Fed. R. Civ. P. 23.

158.     The Entity Defendants all employed Plaintiff and those similarly situated.

159.     Plaintiff and those similarly situated worked for these Defendants as employees and these Defendants failed to pay Plaintiff and those similarly situated all wages due.

160.    These unpaid wages were caused by Defendants' failure to pay Plaintiff and those similarly situated the promised 5% commissions earned on each service performed, in accordance with terms of the contract between Plaintiff (and those similarly situated) and the Entity Defendants.

161.    As such, these Defendants failed to pay all wages due under the law and therefore violated state wage payment statutes, including Colo. Rev. Stat. § 8-4-101, *et seq.*

162.    Plaintiff and those similarly situated are entitled to damages and attorneys' fees for their unpaid wages.

163.    Plaintiff demands payment on behalf of herself and all putative class members for whom she brings bring this claim in an amount sufficient to provide compensation for all unpaid wages. This demand for payment is continuing and is made on behalf of any putative class members whose employment has terminated or terminates at any time in the future or who have been inadequately paid on any regular pay periods and who continue to be employed by these Defendants. Such payment should be made care of undersigned counsel at undersigned counsel's address, included in the signature block.

### FIFTH CLAIM FOR RELIEF
### Civil Theft For Withholding Tips To Compel Labor
### COLO. REV. STAT. §§ 18-4-401, *et seq.*
### (Named Plaintiff and The Rule 23 Class vs. All Defendants)

164.    Plaintiff hereby incorporates all paragraphs of this Complaint as though fully set forth herein.

165.    As set forth above, Plaintiff asserts this count on her own behalf and on behalf of all those similarly situated pursuant to Fed. R. Civ. P. 23.

166.     By withholding tips until and unless Plaintiff and those similarly situated performed uncompensated labor, Defendants knowingly retained and/or exercised control over a thing of value without authorization and/or by threat.

167.     Defendants demanded that Plaintiff and those similarly situated perform uncompensated labor, to which Defendants were not legally entitled, as a condition of restoring their tips to Plaintiff and those similarly situated.

168.     Plaintiff and those similarly situated are therefore each entitled to the following pursuant to Colo. Rev. Stat. § 18-4-405:

   i.     $200 or three times the amount of actual damages sustained, whichever is greater;

   ii.    reasonable attorney's fees and costs; and

   iii.   other relief as allowed by law.

**SIXTH CLAIM FOR RELIEF**
**Fair Labor Standards Act Retaliation**
**29 U.S.C. § 215(a)(3)**
**(Plaintiff Lisa Miles vs. All Defendants)**

169.     Plaintiff hereby incorporates all paragraphs of this Complaint as though fully set forth herein.

170.     Defendants discriminated and retaliated against Plaintiff Miles because she filed a legal claim against them under the FLSA.

171.     Plaintiff Miles' filing of a claim against Defendants alleging that Defendants violated the FLSA was an activity protected by the FLSA.

28

172.     Plaintiff Miles suffered an adverse action when Defendants filed legal claims against her after she engaged in the protected activity of filing a claim against them under the FLSA.

173.     A causal connection exists between Plaintiff Miles' filing of the FLSA claim against Defendants and Defendants' filing legal claims against Plaintiff Miles.

174.     Defendants' filing claims against Plaintiff Miles would not have occurred but for Plaintiff Miles' filing FLSA and other legal claims against Defendants. The immediate cause or motivating factor in Defendants' filing claims against Plaintiff Miles was her assertion of FLSA and other legal rights.

175.     Defendants' conduct was malicious or in reckless disregard of Plaintiff Miles' rights.

176.     Plaintiff Miles is therefore entitled to all legal and equitable relief appropriate under 29 U.S.C. § 216(b), including but not limited to economic damages, liquidated damages, compensatory damages, and punitive damages.

**SEVENTH CLAIM FOR RELIEF**
**Colorado Wage Claim Act ("CWCA") Retaliation**
**COLO. REV. STAT. § 8-4-120**
**(Plaintiff Lisa Miles and others similarly situated vs. Entity Defendants)**

177.     Plaintiff hereby incorporates all paragraphs of this Complaint as though fully set forth herein.

178.     The Entity Defendants discriminated and retaliated against Plaintiff Miles for filing a legal claim against Defendants alleging that Defendants violated the CWCA.

179.     Plaintiff Miles's filing of a CWCA claim against Defendant on behalf of herself and others similarly situated was an activity protected by the CWCA.

180.    Defendants intimidated, threatened, restrained, coerced, blacklisted, discharged, or otherwise discriminated against Plaintiff Miles and other similarly situated employees.

181.    Plaintiff Miles and others similarly situated are protected by the anti-retaliation provision of the CWCA. Among other things, they are all employees who may testify in a proceeding on behalf of themselves, or others, regarding afforded protections under the CWCA.

182.    Plaintiff Miles suffered an adverse action when Defendants filed legal claims against her after she engaged in the protected activity of filing a claim against them under the CWCA and other laws.

183.    A causal connection exists between Plaintiff Miles's filing of the CWCA claim against Defendants and Defendants' filing legal claims against Plaintiff Miles, and their intimidation, threats, restraints, coercion, blacklisting, discharge, and/or other discrimination against Plaintiff Miles and other similarly situated employees who may testify.

184.    Defendants' filing claims against Plaintiff Miles and others, and their retaliation, intimidation, threats, restraints, coercion, blacklisting, discharge, and/or other discrimination against Ms. Miles and other members of the class, would not have occurred but for Plaintiff Miles's filing CWCA and other claims against Defendants, and the possibility that members of the class may participate and/or testify in a proceeding against them.

185.    The immediate cause or motivating factor in Defendants' filing claims against Plaintiff Miles was her assertion of CWCA rights (among other rights).

186.    The immediate cause or motivating factor in Defendants' retaliation, intimidation, restraints, coercion, blacklisting, discharge, and/or other discrimination against Plaintiff Miles and other members of the class was Plaintiff Miles's assertion of CWCA rights (among other

rights) and the possibility that other members of the class may participate and/or testify in the CWCA suit.

187.    Plaintiff Miles and other members of the class suffered damages as a result of Defendants' retaliation, intimidation, threats, restraint, coercion, blacklisting, discharge, or other discrimination against employees who have filed claims against Defendants under the CWCA or related law, or who have testified or may testify in any proceeding.

188.    Plaintiff Miles and other similarly situated employees are therefore entitled to injunctive relief, economic damages, compensatory damages, and punitive damages.

**EIGHTH CLAIM FOR RELIEF**
**Negligence *Per Se***
**(Plaintiff Lisa Miles and others similarly situated vs. All Defendants)**

189.    Plaintiff hereby incorporates all paragraphs of this Complaint as though fully set forth herein.

190.    When Defendants filed legal claims against Plaintiff Miles, Defendants had a duty to Plaintiff Miles to refrain from retaliating against Plaintiff Miles for filing a claim against Defendants under the CWCA.

191.    Defendants likewise had a duty to refrain from retaliating, intimidating, threatening, restraining, coercing, blacklisting, discharging, or otherwise discriminating against Plaintiff Miles and other employees who filed any complaint or instituted or caused to be instituted any proceeding under the CWCA or related law or who have testified or may testify in any proceeding regarding afforded protections under the CWCA.

192.    At the time Defendants filed claims against Plaintiff Miles, COLO. REV. STAT. § 8-4-120 prohibited employers from retaliating, intimidating, threatening, restraining, coercing, blacklisting, discharging, or otherwise discriminating against employees who have filed claims

under the CWCA or related law, or who have testified or may testify in any proceeding on behalf of himself, herself, or another regarding afforded protections under the CWCA.

193.    Plaintiff Miles was a member of the group of persons COLO. REV. STAT. § 8-4-120 was intended to protect, as were the other members of the class.

194.    One of the purposes of COLO. REV. STAT. § 8-4-120 was to protect against the type of injuries sustained by Plaintiff Miles because of Defendants' retaliation against her for filing a claim against them under the CWCA.

195.    Defendants' filing claims against Plaintiff Miles violated COLO. REV. STAT. § 8-4-120.

196.    Another purposes of COLO. REV. STAT. § 8-4-120 was to protect against the type of injuries sustained by Plaintiff Miles and the class because of Defendants' retaliation, intimidation, threats, restraint, coercion, blacklisting, discharge, or other discrimination against employees who have filed claims against Defendants under the CWCA or related law, or who have testified or may testify in any proceeding on behalf of themselves or another regarding afforded protections under the CWCA.

197.    Defendants' retaliation, intimidation, threats, restraint, coercion, blacklisting, discharge, or other discrimination against employees who have filed claims against Defendants under the CWCA or related law, or who have testified or may testify in any CWCA proceeding, violated COLO. REV. STAT. § 8-4-120.

198.    In enacting COLO. REV. STAT. § 8-4-120, the Colorado Legislature intended to create a private right of action for violations of the statute, and an implied civil remedy is consistent with the legislative scheme of the CWCA and COLO. REV. STAT. § 8-4-120.

199.    Plaintiff Miles suffered damages as a result of Defendants' filing of legal claims against her. Plaintiff Miles's damages were proximately, actually, and legally caused by Defendants' violation of COLO. REV. STAT. § 8-4-120.

200.    Plaintiff Miles and other members of the class suffered damages as a result of Defendants' retaliation, intimidation, threats, restraint, coercion, blacklisting, discharge, or other discrimination against them.  Plaintiff Miles's and the class members' damages were proximately, actually, and legally caused by Defendants' violation of COLO. REV. STAT. § 8-4-120.

## DEMAND FOR JURY TRIAL

201.    Plaintiffs demand a trial by jury for all issues so triable.

## PRAYER FOR RELIEF

202.    Plaintiffs respectfully request an Order from this Court:

a.     Certifying an opt-in class pursuant to the FLSA, 29 U.S.C. §§ 201, *et seq.*;

b.     Certifying the Rule 23 Class, naming the named Plaintiff as class representative of the class, and naming Plaintiff's counsel as class counsel;

c.     granting judgment in favor of Plaintiffs and against all Defendants;

d.     awarding Plaintiffs and the Rule 23 Class their actual damages and any applicable statutory damages;

e.     awarding Plaintiff Miles and those similarly situated damages and liquidated damages under the FLSA;

f.     awarding Plaintiffs and those similarly situated $200 or treble damages, whichever is greater, under Colorado's Rights in Stolen Property Statute;

g.      awarding Plaintiff Miles and those similarly situated injunctive relief and economic, compensatory, and consequential damages, including damages for emotional distress, on all claims allowed by law in an amount to be determined at trial;

h.      awarding Plaintiff Miles and those similarly situated punitive damages on all claims allowed by law and in an amount to be determined at trial;

i.      awarding Plaintiffs and those similarly situated their costs;

j.      awarding Plaintiffs and those similarly situated their attorneys' fees;

k.      awarding Plaintiffs and those similarly situated prejudgment and post-judgment interest, when allowable by law; and

l.      granting such other relief as this Court deems just and proper.

DATED this 27th day of August 2018.

Respectfully Submitted,

KILLMER, LANE & NEWMAN, LLP

*s/ Mari Newman*
Mari Newman
Liana Orshan
Tania Valdez
1543 Champa St., Suite 400
Denver, CO 80202
Tel.: 303-571-1000
Fax: 303-571-1001
Email: mnewman@kln-law.com
        lorshan@kln-law.com
        tvaldez@kln-law.com

TOWARDS JUSTICE

*s/ Alexander Hood*
Alexander Hood
David Seligman
1410 High St., Suite 300
Denver, CO 80218

Tel.: 720-239-2606
Fax: 303-957-2289
Email: alex@towardsjustice.org
          david@towardsjustice.org

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on August 27, 2018, I filed the foregoing via CM/ECF, and CM/ECF will generate a Notice of Electronic Filing to the following:

Raymond M. Deeny
Sherman & Howard
90 South Cascade Avenue, Suite 1500
Colorado Springs, Colorado 80903
Direct: (719) 448-4016
rdeeny@shermanhoward.com

Heather Fox Vickles
Brooke A. Colaizzi
Sherman & Howard
633 Seventeenth Street, Suite 3000
Denver, Colorado 80202
Direct: (303) 299-8471
Facsimile: (303) 298-0940
bcolaizzi@shermanhoward.com
hvickles@shermanhoward.com

*Counsel for Defendants*

KILLMER, LANE & NEWMAN, LLP

*s/ Jesse Askeland*
_____
Jesse Askeland